Filed 4/22/16  In re A.I. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re A.I., a Person Coming Under the Juvenile Court Law. | B258915 (Los Angeles County Super. Ct. No. CK99984) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>THOMAS I.,<br><br>    Defendant and Appellant. | |
| In re A.I., a Person Coming Under the Juvenile Court Law. | B261365 (Los Angeles County Super. Ct. No. CK99984) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>WENDY W. et al.,<br><br>    Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Debra Losnick, Judge.  Affirmed in part, reversed in part and remanded.

Kate M. Chandler, under appointment by the Court of Appeal, for Defendant and Appellant Wendy W.

Matthew I. Thue, under appointment by the Court of Appeal, for Defendant and Appellant Thomas I.

Mary C. Wickam, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Tracey F. Dodds, Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

A juvenile court's jurisdictional order may be challenged in a Welfare and Institutions Code section 388 petition.[1]  (*In re Brandon C.* (1993) 19 Cal.App.4th 1168, 1173.)  *In re Brandon C.* held that a parent's section 388 petition alleging that a critical eyewitness to an alleged sexual molestation recanted her testimony "plainly state[d] a prima facie case for relief under section 388, and if properly filed in the juvenile court, would warrant a hearing on the merits of a motion pursuant to that section."  (*In re Brandon C.*, at p. 1172.)

This case falls squarely within the holding of *In re Brandon C.*  The dependency case originated in the midst of parents' contentious divorce and involved allegations father sexually molested his then three-year-old daughter, A.I.  Father vehemently denied the allegations.  After finding both mother and father credible, the court sustained the allegations.  Subsequently, while jurisdiction was pending, A.I. recanted, and other evidence potentially undermined mother's credibility.  Based on this new evidence, father

---

[1]     Undesignated statutory citations are to the Welfare and Institutions Code.

2

sought to amend the jurisdictional order, and the trial court denied his section 388 petition *without a hearing.*[2]

The issue before us is not whether father's petition should be granted on the merits, but only whether the juvenile court was required to hold a hearing. We conclude, the juvenile court should have held a hearing on father's section 388 petition. (*In re Brandon C., supra*, 19 Cal.App.4th at p. 1173.) "Allegations of child molestation are serious . . . . The consequences of being wrong—*on either side*—are too great." (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1754.)

This appeal also concerns mother's challenge to the court's exit order awarding the parents shared custody. We find no error.

We affirm the juvenile court's custody order. We conditionally reverse the juvenile court's order terminating jurisdiction and the order denying father's section 388 petition without a hearing. We remand the case to the juvenile court to hold a hearing on father's section 388 petition.

## BACKGROUND

Wendy W. (mother) and Thomas I. (father) were married in 2004 and separated in 2011.[3] A.I. was born in 2009. In June 2013, when the dependency proceeding commenced, mother and father had been separated for over two years and were in the midst of a divorce proceeding. Father reported that when he and mother first separated he had custody of A.I. about 70 percent of the time, but later his time was reduced to 50 percent. A social worker reported that father and mother shared custody of A.I. for two years, and then father had custody on weekends beginning in May 2013. Mother denied

---

[2] The juvenile court granted another portion of father's section 388 petition concerning visitation. Visitation is not at issue on appeal, and we discuss the petition only in the context of the request to change the jurisdictional order.

[3] Mother reported that her stepfather was a pedophile who molested her sister and tried to molest her. Mother's sister indicated that she had been abused but mother had not. Mother's sister was in foster care for three months while the child sexual abuse was investigated.

that she and father ever shared custody of A.I. She testified that father had custody of A.I. from Thursday evening through Sunday morning.

Father and K.L. began dating in December 2012.

## 1. Los Angeles County Department of Children and Family Services' Reports in Advance of the Jurisdictional Hearing

This case commenced when someone reported statements mother had made regarding A.I. Mother said that A.I. told her "[t]he girl goat should suck on the boy goat's penis." When viewing a jar of Vaseline, A.I. stated, "my daddy says this is for his penis" and "moved her hand up and down." A.I. also said, "Daddy and K[.L.] have a penis. The penis goes on your butt." Additionally, A.I. molded a penis from play dough.

When interviewed by a social worker, mother confirmed that A.I. made these statements. Mother reported that when she lived with father, he walked naked in the house and watched pornography. Mother also reported that during their marriage father used Vaseline to masturbate.

Father confirmed that A.I. had been making sexual references and stated that he did not know where A.I. had heard these terms. Father acknowledged that he allowed A.I. to be in the bathroom when he showered because he did not want to leave her unattended. Father denied putting Vaseline on his penis in front of A.I. Father denied masturbating in front of A.I. He further denied asking A.I. to rub her vagina.

In her first interview with social workers, A.I. "report[ed] no inappropriate touching or sexual abuse." A.I. said that she never saw father naked. She never saw father and K.L. lie in bed naked. But she also acknowledged that she has watched father put Vaseline on his penis. A.I. remembered molding a penis from play dough. A.I. denied saying that "the girl goat should suck on the boy goat's penis."

In a second interview, A.I. told a social worker that Vaseline was for father's penis. A.I. said that she saw father rub it on his penis as both of them were naked on his bed. A.I. asked the social worker to draw a picture of her private parts. When the social worker complied, A.I. asked, "is that my vagina[?]" When asked what she does with her vagina, A.I. said that "you rub it sometimes" and it "feels good sometime." A social

4

worker concluded father sexually abused A.I.. (A.I. did not make similar statements when interviewed by police.)

A.I. and mother's therapist reported that A.I. told her she and father "got naked together and laid down on a bed together." The therapist reported that A.I. told her father instructed her to rub his penis and that father rubbed her vagina.

## 2. A.I.'s Forensic Interviews

In June 2013, A.I. was interviewed at length by a nurse. A.I. stated that she was three years old. When asked what she liked and did not like, A.I. said she liked playing with father and did not like having her "private checked at the doctor." She did not want to talk about going to the doctor. A.I. stated that she liked to snuggle with father and to go to Disneyland with father. When asked to tell the interviewer about snuggling with father, A.I. asked the interviewer to look at her shoes. When asked again, A.I. responded, "I like my daddy and me. I just want to snuggle with him."

A.I. repeated that she missed father. When asked about watching television at father's house, A.I. responded, "I just love him." And she added, "[a]nd I want my mommy."

When asked about her "pee pee," A.I. told the interviewer that she used a "potty word." When asked who she slept with at her daddy's house, the following colloquy ensued:

"A. K[.L.] with my daddy.

"Q. Huh. And tell me about that.

"A. I can't. It's a secret.

"Q. A secret. Who told you it's a secret?

"A. My dada.

"Q. Your daddy?

"A. No, I tell myself."

When asked what she wears when she sleeps with daddy, the following colloquy ensued:

"Q. What do you wear when you sleep with daddy?

5

"A. His pajamas.

"Q. And what does daddy wear?

"A. No clothes.

"Q. No clothes?

"A. No, not a shirt. Just—just doesn't

"Q. Just what?

"A. Look it. You can do that.

"Q. You can do that. That's the top to put on my pen. [¶] So you said daddy wears no shirt. Tell me about his pants.

"A. Do you write that?

"Q. What did I write? You have to tell me something to write. [¶] So tell me about—you said daddy wears no shirt. So I'm going to write, 'no shirt.'

"A. No shirt.

"Q. And tell me about his pants when he goes to sleep.

"A. He doesn't. He only just wears underwear.

"Q. He just wears underwear. Okay.

"A. That's the—I love my dad.

"Q. Okay. And how about K[.L.]?

"A. She wears only—she doesn't wear any clothes.

"Q. She doesn't? [¶] And can you see her when she's not wearing any clothes?

"A. Yeah.

"Q. Okay.

"A. And she has a dog named Cooper . . . ."

A.I. stated that she sleeps on father's bed and K.L. sleeps on the floor "[a]nd then she goes to jail." A.I. reported that K.L. "goes potty in her pants."

A.I. denied anyone looked at her private part. When asked if someone tried to do that, A.I. responded "[m]amma." She also said her neighbor opened the door when she was using the bathroom. A.I. said her private part did not hurt.

A.I. said that a boy's private part is called "[a] penis." She indicated that she never saw anyone's penis.

A.I. said that she does not like to play with K.L.; she wanted to play only with father.

During the interview, A.I. did not discuss father using Vaseline, did not say that father rubbed his penis or that father instructed her to rub her vagina.

A forensic medical report indicated that "[c]hild [was] very easily distracted [and] gave no disclosure of sexual abuse—no inappropriate touching." When an officer attempted to speak to A.I. about the allegations, she refused to discuss it.

### 3. *Jurisdictional Hearing*

Several witnesses testified at the contested jurisdictional hearing. The evidence supporting the court's jurisdictional finding included mother, mother and A.I.'s therapist, and social workers who interviewed A.I. Father and K.L. strongly denied the allegations.

Mother testified that A.I. had made sexual statements and engaged in sexualized conduct such as forming a penis out of play dough. A.I. said that a girl goat should suck on the boy goat's penis. A.I. put a "wonder stick" between her legs and said, "don't look at my penis." Mother testified that A.I. "pressed her vagina into the bars of [a] shopping cart, rubbing herself back and forth." She testified that A.I. made sexual statements daily. Mother testified that A.I. handed her a jar of Vaseline and said, "my daddy says this is for his penis." Mother testified that she did not coach A.I.

A.I.'s therapist (who was also mother's therapist) testified that A.I. told her father sometimes removed his underwear and allowed her to touch his private parts. A.I. told the therapist that father rubbed her vagina and buttocks. A.I. told mother that father used Vaseline on his penis. The therapist did not believe A.I. had been coached.

Social worker Marquita Johnson testified that when she spoke to A.I., A.I. said that she saw father put Vaseline on his penis. When Johnson asked how, A.I. opened her legs and made a stroking motion. A.I. also said father put on lotion with a stroking motion. When Johnson asked A.I. about the goat statement, A.I. denied making it. A.I.

7

confirmed she made a penis out of play dough. Johnson testified that A.I. did not appear to have been coached.

Social worker Kimberly Melton testified that when she interviewed A.I., A.I. said that she rubbed her vagina. A.I. said it made her feel good. When asked where she learned that, A.I. replied from father. When she saw a jar of Vaseline, A.I. said that father used it on his penis. A.I. opened her legs and moved her hands. When asked where did you see daddy do that, she responded in the bed. Melton did not believe A.I. had been coached.

A.I.'s forensic interview was admitted into evidence at the jurisdictional hearing.

Father admitted that he occasionally masturbated, but denied masturbating in front of A.I. He denied ever using Vaseline as a lubricant. Father testified he kept Vaseline in the house because A.I. was prone to diaper rashes. Father stated he was naked in front of A.I. when he was in the shower and she would sit on the floor in the bathroom. Father denied that he instructed A.I. to rub his penis and to rub her vagina.

K.L. testified that she and father had been dating for 10 months. She and father were living together for two months. K.L. testified father always acted appropriately with A.I. A.I. sometimes slept in the bed with her and father. Father never used Vaseline as lubricant but sometimes masturbated.

On October 16, 2013, the court sustained the allegations and assumed jurisdiction over A.I. As sustained, the petition stated: "On prior occasions, the child [A.I.]'s father, Tom I[.], sexually abused the child by masturbating in the child's presence while the father and child laid naked on the bed. The father used Vaseline to masturbate the father's penis and the father instructed the child to rub the child's vagina. On prior occasions, the father touched the child's vagina while the child and father were naked on a bed together. The father instructed the child to touch and rub his penis with her hands. Such sexual abuse of the child by the father endangers the child's physical health and safety, placing the child at risk of physical harm, damage, danger and sexual abuse." (Boldface omitted.)

8

The court explained its ruling as follows: "While it could be argued that both parents sound credible as witnesses, the court then has to look at the child's statements and anything surrounding those statements which would cause me to believe that they are true or untrue. [¶] The court actually finds the goat statement could easily have been a child misunderstanding a goat nursing—a baby goat nursing on the mother's—from the mother. So I am not terribly concerned about the goat statement." The court continued finding that A.I.'s statements "are consistent statements because the child at times was disclosing what had happened to her." "[A]nd the details in this case are very consistent. There is no wavering about what the Vaseline was for, how it was used, the fact that the child was on the bed with the father, the fact that they both were naked. These are terminologies that are well beyond the years of a child of this age." The court found no evidence of coaching. "[C]hildren who have been coached generally do walk in to tell people what's happened by first thing. They can't wait to say it. That is not what happened in this case." By a preponderance of the evidence, the court found that jurisdiction was appropriate.

It is undisputed that ample evidence supported jurisdiction, and although father appealed from the jurisdictional order, his appeal was dismissed after his counsel identified no issues.

## 4. Reunification Period

Throughout the reunification period, father complied with all court orders and regularly visited A.I.[4] A.I. told father she missed him and always was happy to see father. She would ask to go home with father. A.I. asked father about K.L. A social

---

[4]    Los Angeles County Department of Children and Family Services (DCFS) reported: "Overall, father has been compliant with all other programs and has been meeting all of the required in office and out of office monitored visits which have received excellent progress reports from the monitors of these supervised visits which have been approximately 63 visits during this period of supervision." Father actively engaged in therapy and complied with all of his therapist's requests.

9

worker reported that "[A.I.] appears to have a good bond with father and seems to love to play with him."

Father's visits initially were monitored, but he graduated to unmonitored and overnight visits. The only concern was that when A.I. tried to sit in father's lap, the social worker monitoring the visit made it clear she had to sit in a chair. A.I. loved seeing father and was sad only when it was time for the visits to end. She never expressed any fear of being alone with father and instead requested such time. A.I. and father shared a close bond and enjoyed each other's company.

A.I. reported "that she is extremely happy with the visits" and that she "would like to have more visits with father." A.I. "has stated that the only part of the visits that she doesn't like is when she is asked to say goodbye after the visits." When asked if there was any inappropriate touching, A.I. responded "without any hesitation, 'no.'"

Father's four monitors were interviewed. The first reported father and A.I. had a wonderful relationship and it did not appear to him A.I. had ever been sexually abused. In nine months, A.I. once referred to vagina as a "funny word," but made no other sexual comments. Another monitor observed father and A.I. for six months and reported that A.I. showed no sign of distress during the visits and no sign of sexual abuse. "[A.I.] does not make any inappropriate comments, no sexual movements or behaviors." The third monitor saw no inappropriate comments and no signs of sexual behavior. The fourth monitor reported that there were no inappropriate comments or concerns during the visits.

Except mother, no other person observed A.I. act sexually. One social worker who monitored father's visits never saw A.I. "act out in a sexual way or make any inappropriate comments during the visits." It appeared to her that father and A.I. had "a very healthy close relationship." The other social worker who monitored father indicated father and A.I. appeared very attached. A.I.'s therapist also did not observe sexual behavior or comments. Father's therapist reported no concerns and saw "no signs of him being a sexual perpetrator." She later reported that she "continue[d] to not see anything that leads me to believe that he would cause any harm to his daughter." Maternal aunt and maternal grandmother both reported A.I. did not show signs of sexual abuse.

10

A.I.'s teachers did not observe any sexually inappropriate conduct. The director of the school did not observe any sexual acting out behavior or language. However, A.I.'s teachers identified some behavioral concerns such as not following directions and interrupting other students.

A.I. repeatedly told her social worker that she missed father, wanted to see him more, and wanted to live with father and K.L. The social worker believed that mother "has purposely slowed this case down." The social worker concluded neither mother nor father pose a physical threat to the child.

## 5. *Mother's Reports During the Reunification Period*

Mother reported substantial sexualized conduct. Her log from October 15, 2013, through January 20, 2014, included the following incidents. A.I. "pressed her vagina into her car seat's leg divider and had a glazed over look on her face." A.I. said, "I had a funny dream and Wreck It Ralph took off his shirt and pants." A.I. said, "I think Wreck It Ralph took his pants off." A.I. "put her stuffed animal's face on her vagina." A.I. told mother that someone else had a doll, and the doll's pants would come off. A.I. rubbed her vagina on the way to a visit. A.I. said, "I am going to lick Tafita's butt because she is not being nice." A.I. had a dream in which someone "took all her clothes off." A.I. said, "I smell vagina." A.I. said, "Did you know that there's a jail for adults and for kids. My daddy told me. When I'm a big girl I can do whatever I want." A.I. said, "Just look at your own penis!" A.I. asked mother, "how do you make a private part for a girl out of play dough?" A.I. rubbed her vagina and then licked her fingers. A.I. said, "You should have a penis on your face." A.I. said, "Mom, did you know you are the queen of stupid? When I am a big girl I can do whatever I want." A.I. told mother that "she can't tell me what her daddy says because it's a secret." A.I. told mother she could not tell her about her dream because it was a secret. A.I. said, "Did you know that Cindy was on an airplane and opened up the bathroom door and a man was in it." A.I. said, "You can say stupid in a nice way. My daddy said so." A.I. said, "Mom did you know that my daddy has the short underwear?" A.I. said, "Mom, look I made a butt."

Mother was concerned that father called A.I. too many times and requested that his calls be shortened to 30 minutes. Mother reported that father was harassing her when they exchanged custody of A.I. She complained that father was late for exchanges. Mother's stepfather also complained father was late in dropping off A.I. for scheduled exchanges, that he did not feed her nutritious meals, and that father put A.I. in her car seat when mother's stepfather insisted that he would do it. Maternal grandmother expressed concern that father was difficult to deal with and did not respect the family, and father would not end his calls with A.I. even at bedtime.

The social worker who reviewed mother's description of A.I.'s behavior over a seven-month period observed "no evidence that any of th[e] information [reported by mother] is true and has an overwhelming amount of statements suggesting the information is untrue." "CSW spoke with five collaterals who each monitored multiple visits between [A.I.] and the father and they all reported not seeing or believing such behaviors or statements have occurred. CSW also interviewed social workers and family members who also have not seen these behaviors. In fact the child's maternal grandfather recently found out about these allegations and said his daughter, the mother, is lying to DCFS and the Court and he believes the father never committed sexual abuse to the child. CSW sees the mother's behavior as neglectful to [A.I.] as she continues to portray [A.I.] as this severely sexually abused child which over time DCFS has not observed."

When A.I. denied statements to police, "mother told the officer she did not do her job well." The social worker recommended mother undergo a psychological evaluation.

### 6. Subsequent Referrals Against Father Were Unfounded

In April 2014, DCFS investigated a referral from mother's neighbor about a "[p]otty in the mouth" game.[5] When A.I. was questioned by a social worker about this

---

[5] Amy, A.I.'s caregiver and family friend, reported this incident. Amy reiterated that A.I. said she played "potty in the mouth" with father. She also reported that once A.I. urinated in her pants and was returned without underwear. Amy reported that her three-year-old son repeatedly said, "[A.I.] touch it," and pointed to his penis.

game she "said that [it] is when people shake whipped cream and spray it in your mouth." A.I. also told police that the "[p]otty in the mouth game" is when her neighbor Amy put whipped cream in her mouth. Father denied ever hearing of a "[p]otty in your mouth" game. When mother was asked she had "a very difficult time answering questions with specific answers." The social worker interviewing mother concluded that "mother was much more concerned with keeping the child away from the father and the father being punished, rather than the treatment for [A.I.]." The incident was closed as unfounded. With respect to this incident, an allegation of general neglect and emotional abuse against mother was added and found inconclusive.

Another referral reported in June 2014 against father also was determined unfounded. Mother reported that A.I. kissed father's genitals. A video of the interaction did not support mother's statement, and both A.I. and father claimed that A.I. was giving father a "raspberry," which mother had instructed her to do. A.I. told the social worker, "[m]y mommy said it would be funny if I gave my daddy a raspberry at the end of the visit . . . ." The social worker concluded that "mother purposely shared false information with her neighbor that led to the child abuse report." The social worker believed mother "exposed [A.I.] to more DCFS and police interviews hoping that the child abuse referral would slow down the father's reunification process . . . ." The social worker also saw no evidence of other behaviors mother reported A.I. committed over seven months.

The social worker recommended adding another allegation of emotional abuse against mother. The social worker concluded that mother intended to delay the reunification process between A.I. and father. The social worker was concerned that "mother again exposed [A.I.] to needless interviews by the police and DCFS."

### 7. A.I. Denies Father Used Vaseline

In the course of investigating the above referral, A.I. was interviewed again. She told the social worker that the Vaseline "stuff wasn't true." When asked why she said those things, A.I. replied, "I don't know."

## 8. *Father's Section 388 Petition*

On June 5, 2014, father filed a section 388 petition seeking to overturn the juvenile court's jurisdictional findings and emphasizing the evidence subsequent to the jurisdictional hearing, including A.I.'s statement that the "Vaseline stuff" was untrue. Father indicated the requested change in the jurisdictional order would be in A.I.'s best interest because A.I. adores father "and the continued restrictions on his being full[y] in her life are detrimental to her." Father stated that he once was A.I.'s primary caretaker and that "mother will continue to sabotage father and [A.I.]'s relationship." The court denied the petition without a hearing. Father appealed from the order denying his section 388 petition without a hearing.

## 9. *Jurisdiction Is Terminated*

In October 2014, DCFS recommended terminating jurisdiction and awarding legal and physical custody to both parents. Father objected to the termination of jurisdiction prior to evaluating his section 388 petition seeking to overturn the jurisdictional order. He argued if the court decided to terminate jurisdiction it was in A.I.'s interest for him to share custody equally with mother. Mother argued that equally shared custody was not in A.I.'s best interest because it was a significant change in custody. Mother's counsel argued that "stability [was] a huge concern for a child." The court disagreed with mother's counsel's argument that the dependency court should issue an order consistent with the current custody arrangement. The court explained: "I think the court has moved excessively slowly in adding very gradually time for the father. I think it's time for us to move on, to close this case, and go back to what I would consider a shared custody arrangement."

The court stated that it had not seen a last minute report that was filed that day but understood the report did not change the department's recommendation. No counsel objected to proceeding without the report.

The court terminated jurisdiction and ordered mother and father share custody equally. Father agreed to allow A.I. to attend behavioral counseling, which the school had recommended.

Both mother and father appealed from the order terminating jurisdiction. The appeal was consolidated for purposes of argument and opinion with father's appeal from the denial of his section 388 petition. The appeal was not consolidated for purposes of briefing. Nevertheless, in the interest of justice, we consider mother's untimely arguments addressing the denial of father's section 388 petition even though it was filed after briefing had concluded in the appeal from the order denying father's section 388 petition.

## DISCUSSION

We first consider the juvenile court's denial of father's section 388 petition without a hearing. We then turn to mother's challenges to the order awarding the parents shared custody of A.I.

### 1. Father's Section 388 Petition

"To prevail on a section 388 petition, the moving party must establish that (1) new evidence or changed circumstances exist, and (2) the proposed change would promote the best interests of the child." (*In re J.T.* (2014) 228 Cal.App.4th 953, 965.) "A parent need only make a prima facie showing of these elements to trigger the right to a hearing on a section 388 petition and the petition should be liberally construed in favor of granting a hearing to consider the parent's request." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806; see *In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1413-1414 [§ 388 "petition must be liberally construed in favor of its sufficiency"].) "The court may deny the application ex parte only if the petition fails to state a change of circumstance or new evidence that even *might* require a change of order or termination of jurisdiction." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 461.) This court reviews the decision to deny the petition without a hearing for abuse of discretion. (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1158.)

Here, the new evidence emphasized in father's section 388 petition *might* require a change of the jurisdictional order. (*In re Brandon C., supra*, 19 Cal.App.4th at pp. 1171-1172.) A.I. recanted a key allegation supporting jurisdiction, and a statement central to the social workers' initial conclusions that A.I. had been sexually abused. If A.I.'s recantation is genuine, there is a serious question as to the adequacy of the jurisdictional

15

findings. In this close case in which the juvenile court found both mother and father credible and relied on A.I.'s consistency in determining that jurisdiction was warranted, her recantation is significant. Moreover, in addition to A.I.'s apparent recantation, there was evidence undermining mother's credibility that warranted the court's review. Specifically, mother's claim that A.I. kissed father's genitals was unsupported not only by A.I.'s and father's statements but also by a video of the events. The social worker observing the family concluded that mother's allegations of abuse were unfounded and began to question other allegations mother had made.

The next issue is whether father presented a prima facie case that it would be in A.I.'s best interest to reverse the jurisdictional order if it is warranted by new evidence. We conclude such reversal, if warranted, would be in A.I.'s best interest. A.I. and father shared a close bond. A.I. had a strong, stable relationship with father, always enjoyed her visits with father, and was sad only when the visits ended. She repeatedly asked social workers to spend additional time with father and indicated a desire to live with father and K.L. A false accusation of sexual molestation not only affects father but also affects A.I. as it impinges on her relationship with him. Here, mother continues to argue that father should not have shared custody because he cannot be trusted with A.I., suggesting a continued need for judicial resolution of whether father sexually molested A.I.

Because the section 388 order must be reversed, the order terminating jurisdiction also must be reversed. (Cf. *In re Hunter W.* (2011) 200 Cal.App.4th 1454, 1465 [reversing § 388 order required reversing subsequent § 366.26 order]; *In re Lesly G.* (2008) 162 Cal.App.4th 904, 916 [same].) The court's order terminating jurisdiction does not render father's appeal moot because it could have severe consequences in future family law proceedings. (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 716.)

## 2. *No Error in Awarding Custody to Both Parents in Equal Proportions*

Mother argues that the court's termination order, which awarded equally shared custody, was erroneous because "the risk of sexual abuse by father still existed, father had conducted himself abysmally while picking up the child, the child's behavior was riddled with disturbing behaviors, and most importantly, there was simply no evidence

16

that it was in the child's best interests to expand father's visits to 50% of the child's time." Mother also argues the court applied the wrong legal standard when it decided the issue. As we shall explain, we find no error.

At the outset, mother's argument that the court misunderstood the legal standard is not persuasive. The juvenile court must consider the best interest of the child when it terminated jurisdiction. (*In re John W.* (1996) 41 Cal.App.4th 961, 973, superseded on other grounds by statute as noted in *In re Marriage of David & Martha M*. (2006) 140 Cal.App.4th 96, 102-103.) The record indicates the juvenile court agreed with mother's counsel that it must consider A.I.'s best interest in crafting it's exit order. Specifically, when mother's counsel argued the court must consider A.I.'s best interest, the court responded "correct." Mother's counsel then moved on to a different argument. He argued that it was in A.I.'s best interest to maintain custody in the then current arrangement. The court rejected mother's counsel's argument and referenced the parties' arrangements prior to the dependency proceeding. This reference to the prior arrangements was in response to counsel's argument that the current arrangement should be maintained. It does not show the court was unaware of the legal standard, which it previously correctly identified.

We review the exit order for abuse of discretion. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300-301.) The court was not required to maintain the custody arrangement at the conclusion of the dependency proceeding as mother's counsel argued. As the juvenile court explained, father's visits started as monitored and progressed through the dependency proceedings. They initially were limited because jurisdiction was based on serious allegations against him. But the court acted well within its discretion in concluding that father no longer posed a risk to A.I. at the time the dependency proceedings terminated. While there was conflicting evidence regarding the parties' custody arrangements prior to the dependency proceedings, the court was not required to resolve that issue; it was required to consider A.I.'s best interest at the time the dependency proceedings terminated.

17

In challenging the juvenile court's order, mother views the evidence in the light favorable to her, a standard the juvenile court was not required to adopt. For example, although mother argues A.I. would not be safe in father's custody, the juvenile court considered father's conduct over a year period and determined that shared custody was appropriate. That conclusion is supported by the fact that by the time the court terminated jurisdiction, A.I. was never hurt while she was in father's care even after his visits became unmonitored. Every observer, including social workers, monitors, and father's therapist, concluded that father behaved appropriately with A.I. A.I. regularly asked to spend more time with father and every observer noted that they shared a close bond. When the entire record is considered, it strongly supported the conclusion that joint custody was in A.I.'s best interest. The evidence showed that both parents cared for A.I., both were actively involved in her life, and both ensured that her needs were met.[6]

---

[6]     We grant mother's request to take judicial notice of exhibit A, which was filed in the juvenile court but was not filed in time for the court to consider it prior to the hearing terminating jurisdiction. No counsel objected when the court indicated that it intended to proceed without review of DCFS's final report, which attached exhibit A. Nothing in exhibit A undermines the juvenile court's custody award. It includes a declaration from mother stating that father never had shared custody of A.I. (refuting father's statements that he was the primary caregiver). It also included concerns by A.I.'s teacher describing difficulties in class such as failing to follow directions. It also included mother's neighbor's letter describing the "[p]otty in the mouth" incident that was concluded to be an unfounded referral. Nothing in exhibit A supported the inference that father sexually molested A.I. or that A.I. was or would be harmed while in his custody. While there was some evidence that A.I. was having difficulty following instructions with her peers and may have made inappropriate comments to her three-year-old playmate, there was no evidence father was ill-equipped to address these concerns. Therefore, even assuming mother preserved her argument that exhibit A should have been considered prior to terminating jurisdiction, she fails to show any prejudice.

This case is not like *In re Michael W.* (1997) 54 Cal.App.4th 190, in which the juvenile court refused to hold a hearing prior to terminating jurisdiction and therefore prejudicially failed to consider new probative evidence. (*Id.* at pp. 196-197.) The court held a hearing, considered mother's counsel's argument, and rejected it. Even if the court should have delayed the hearing until after it reviewed exhibit A, mother demonstrated no prejudice and her counsel did not request a continuance.

18

**DISPOSITION**

The juvenile court's custody order is affirmed. In all other respects the juvenile court's order terminating jurisdiction is conditionally reversed. The juvenile court's order denying without a hearing father's section 388 petition seeking to modify the court's prior jurisdictional order is reversed. The case is remanded for the juvenile court to hold a hearing on father's section 388 petition. If the court denies father's section 388 petition, it should reinstate its current termination order. If the court grants father's section 388 petition it should issue a new termination order indicating that the petition was set aside because it was not supported by substantial evidence.


FLIER, J.

WE CONCUR:


RUBIN, Acting P. J.


GRIMES, J.